**UNITED STATES of America,**
**Appellee,**

**Charles Lindburg CARTER, Appellant.**

**No. 20099.**

United States Court of Appeals,
Eighth Circuit.

Sept. 28, 1970.

Emmett Colvin, Jr., Dallas, Tex., and George E. Cochran, Fort Worth, Tex., for appellant.

Bethel B. Larey, U. S. Atty., and James A. Gutensohn, Asst. U. S. Atty., Fort Smith, Ark., for appellee.

Before VOGEL, GIBSON and BRIGHT, Circuit Judges.

VOGEL, Circuit Judge.

Charles Lindburg Carter, defendant-appellant, was indicted by a grand jury which charged:

"That on or about August 23, 1968, in the Western District of Arkansas, at Texarkana, Arkansas, Charles Lindburg Carter did knowingly and wilfully transport in interstate commerce from a point in Texarkana,

Texas, to Texarkana, Arkansas, a certain stolen motor vehicle, to-wit: a 1967 Ford, bearing vehicle identification number 7A56C109119, the property of Bill Baker Used Cars, 10th and Texas Avenue, Texarkana, Texas, knowing the same to have been stolen, in violation of 18 U.S.C. 2312."

He was tried before a jury, found guilty, and thereupon sentenced to three years' imprisonment. On appeal, he raises the single contention that

"Where an issue was submitted to the jury as to the admissibility of the confession, the trial judge was in error in failing to conduct a hearing outside the presence of the jury and in failing to make a record determination as to the admissibility despite defendant's failure to so request."

Finding no error, we affirm.

A brief résumé of the facts in connection with the theft and transportation across state lines is necessary. On August 17, 1968, the defendant appeared at the Bill Baker Used Car Lot in Texarkana, Texas, representing himself as being in the market for buying a car. He requested and was granted permission to drive a 1967 red Ford Galaxie, during which time he removed two keys from the car before returning it to the car lot. Five days later, on August 22, 1968, after business hours, defendant returned to the used car lot at approximately 9:00 or 9:30 P.M. and, using one of the stolen keys obtained August 17, 1968, drove the vehicle from the lot and from the State of Texas into the State of Arkansas. On the same evening, the owner of the car lot passed his place of business and noticed that the car in question was missing. He immediately reported the loss to the Texas and Arkansas law enforcement officers. About 4:30 the following morning, August 23rd, Arkansas police, while on routine patrol, discovered the stolen vehicle behind a business establishment, the motor running, blinker lights flashing and the defendant in the front seat behind the wheel in an intoxicated state. In an-swer to the questions, "Did you interrogate him? Did he make any statements to you at the time?", one of the arresting officers replied, "No, sir." The officer was asked, "Was he in any condition to make any statements?" He answered, "He wasn't in much condition, he didn't make any statements to me." Defendant was placed under arrest and taken to the police station.

Some nine or ten hours thereafter James Weis, a Special Agent for the FBI, interviewed Carter while the latter was in jail, obtaining a signed statement with reference to the offense herein charged. Agent Weis, after testifying that he showed Carter his credentials and advised him of his rights prior to the interview, stated:

"Q When you advised him of his rights, what rights did you advise him of?

"A I read the standard warning and waiver form to him, and then presented it to him. This warning and waiver form states as follows: 'Before we ask you any questions you must understand your rights. You have a right to remain silent, anything you say can be used against you in court, you have a right to talk to a lawyer for advice before we ask you any questions, or to have him with you during the questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning, if you wish. If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have a right to stop answering at any time when you talked to a lawyer. I have read this statement of my rights and understand what my rights are and am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I'm doing. No promises or threats have been made to me, and no pressure or coercion of any kind has been used against me.'

"Q Did he make a statement freely and voluntarily and without any promises of reward or coercion?

"A. That's right.

"Q About what time of the day was it when the statement was made?

"A The statement itself commenced at 2:11 P.M., and it was completed at 2:33 P.M. At 2:33 P.M. the statement was given to Carter for review, at 2:38 P.M. Carter signed the statement, 8/23/68.

\*   \*   \*   \*   \*   \*

"Q Was Mr. Carter sober and in full control of himself, of his physical and mental faculties at that time?

"A Yes, sir.

"Q After you introduced yourself and advised him of all of his rights, did you present a waiver form?

"A I did, sir. I gave him the waiver form—I advised him of his rights orally at 1:21, after advising him of his rights I gave him the waiver form which he read. He said that he understood it and signed it.

"Q. After he did that—after Mr. Carter did that, then did he make a statement to you?

"A Yes, sir, the statement was made at 2:11 P.M."

The waiver signed by Carter was offered in evidence, at which time the court asked defendant's personally selected and employed counsel if there was any objection, to which counsel replied, "No objection."

After signing the waiver, the defendant made a written statement to Agent Weis, which he signed at 2:38 P.M. Such signed statement read as follows:

"I, Charles Lindburg Carter, do voluntarily make this statement to James D. Weis, who has identified himself as a Special Agent of the FBI. I have been advised of my rights by SA James Weis, and I waived these rights on a signed waiver form. I was born November 20, 1928, at Hattiesburg, Mississippi, and my parents are O. D. Carter and Ellen Carter. I have a 12th grade education and can read, write and understand the English language.

"On August 17, 1968, I went to Bill Baker's Used Car Lot, Texas Avenue, Texarkana, Texas, on the pretense of purchasing a car. I took a 1967 Ford Galaxie, four door, red in color, for a test drive alone on the pretense of buying the car. I returned the car approximately one hour later that same day to Bill Baker's Used Car Lot. When I returned the car I kept two keys from the car without the knowledge of Mr. Baker.

"On August 22, 1968, at approximately 9:00 P.M., I went to Bill Baker's Used Car Lot and using the key which I kept, took the 1967 Ford Galaxie, four door, red in color, which I had taken for a test drive on August 17, 1968. The Used Car Lot was closed at the time I took this car, and I did not have Mr. Baker's permission to use the car.

"I drove the car to the Starlight Ballroom on Highway 67 north of Texarkana, Arkansas, where I drank too much and became intoxicated. During the course of the evening, August the 22nd–23rd, '68, the battery went dead in the car, and I hired a Yellow Cab to take me to the L. E. Meyers Construction Company where I am employed. There I got a large ten foot chain which we used to tow the 1967 Ford with the cab. Early in the morning hours I was apprehended by the Texarkana, Arkansas, Police Department on August 23, 1968. I intended to take the car back to Bill Baker's Used Car Lot early in the morning of August 23, 1968, before they opened for business.

"I have read the above statement consisting of this page and one addi-

tional page. I now sign both pages because the statement is true."

The statement was signed "Charles L. Carter", 8/23/68 at 2:38 P.M. When the statement was offered into evidence before the jury, the court again asked defendant's counsel if there was any objection and received the reply, "No objection." The defendant did not testify.

In instructing the jury, the trial court gave the standard instruction with reference to confessions, taken in its entirety from Mathes & Devitt, Federal Jury Practice and Instructions, § 8.16, Confession—Voluntary, page 101, as follows:

"A confession is an admission by the defendant of all the material facts constituting the crime charged. The very nature of a confession requires that the circumstances surrounding it be subject to careful scrutiny always, in order to determine surely whether the confession was voluntarily and intentionally made.

"If the evidence in the case does not convince beyond a reasonable doubt that a confession was made voluntarily and intentionally, the jury should disregard it entirely; on the other hand, if the evidence in the case does show beyond a reasonable doubt that a confession was in fact voluntarily and intentionally made by a defendant, the jury should consider it as evidence in the case against the defendant who voluntarily and intentionally made the confession."

At the close of all of the instructions, and out of the presence and hearing of the jury, the court inquired:

"THE COURT: Any questions or objections, or request for additional instruction on behalf of the Government?

"MR. GUTENSOHN: None on behalf of the Government.

"THE COURT: All right, Mr. Potter, on behalf of the Defendant?

"MR. POTTER: None on behalf of the Defendant."

On this record we are asked to hold that under Jackson v. Denno, 1964, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, and Sims v. Georgia, 1967, 385 U.S. 538, 87 S.Ct. 639, 17 L.Ed.2d 593, that the case should be reversed or that it should be remanded to the District Court for full hearing on the voluntariness of the confession. We do not agree. Among the reasons for holding that there was no error on the part of the trial court in failing to give a Jackson v. Denno hearing are: (1) Some nine to ten hours had elapsed between 4:30 in the morning when defendant was found asleep or intoxicated and the time he was interviewed and the waivers made and the statement given to the FBI; (2) the undisputed testimony is that at that time, that is when interviewed by the FBI, Carter was sober and in full control of himself and his physical and mental faculties. (3) Carter was advised of his rights orally, given a written waiver form, which he read, stating that he understood it, and he then signed it. (4) Carter signed a written statement claiming that he did so voluntarily. (5) Both written waiver and written statement were received in evidence without objection and with defendant's counsel in each instance stating that there was no objection to the introduction of the waiver or the statement. (6) No objection to or exception to the instructions to the jury was taken by defendant's counsel, although he was specifically asked by the court if the defendant had any objections or exceptions. (7) In defendant's counsel's argument to the jury he made no claim whatsoever that the statement given by the defendant to the FBI was not voluntary. As a matter of fact, he capitalized on the statement, referred to it, and pointed out to the jury

that nowhere was the word "stolen" used. He also referred to the fact that the defendant in the statement claimed that although he took the car, he intended to take it back—thus claiming lack of intent to steal.

Defendant maintains that the mere giving to the jury of an instruction on the voluntariness of a confession creates the necessity for a Jackson v. Denno hearing. Among other cases, which we find distinguishable on their facts, defendant directs our attention to People v. Howie, N.Y., 1969, 33 A.D.2d 648, 305 N.Y.S.2d 295, and People v. Huntley, N. Y., 1965, 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179. Read together, *Howie* and *Huntley* implement Jackson v. Denno for the New York state courts. In essence, they require advance notice of the use of a confession by the prosecution coupled with reply notice of objection thereto by the defense, necessitating a Jackson v. Denno hearing. Moreover, *Howie* would seem to hold that even if there is no objection to the confession, the trial court may not instruct on the issue of voluntariness without also holding a separate hearing. If this is the meaning of *Howie*, we find it unpersuasive. The Supreme Court, in Jackson v. Denno, at page 380 of 378 U. S., at page 1783 of 84 S.Ct., made reference to our present factual situation in this fashion:

> "*A defendant objecting to the admission of a confession* is entitled to a fair hearing in which both the underlying factual issues and the voluntariness of his confession are actually and reliably determined." (Emphasis supplied.)

By inference we conclude that a defendant, failing to object, is entitled to no hearing on voluntariness, absent the exceptional circumstances suggested in United States v. Taylor, 7 Cir., 1967, 374 F.2d 753, 756, and discussed in Hizel v. Sigler, 8 Cir., 1970, 430 F.2d 1398. Such exceptional circumstances are not present here.

Affirmed.